# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

SPARTAN BROKERS LLC, a
Michigan Limited Liability
Company,                                       Case No. 2:20-cv-13300

      Plaintiff                            Hon.

v.

BALANCED BIOTECH INC., an
Ohio Corporation, and DAVID P.
JONES, a Rhode Island individual,

      Defendants.
_____

Thomas J. Murray (P56331)
Attorneys for Plaintiff
King & Murray PLLC
355 S. Old Woodward, Ste. 100
Birmingham, MI 48009
(248) 792-2397
tmurray@kingandmurray.com
_____/

## COMPLAINT

Plaintiff, Spartan Brokers LLC, through its attorneys, King & Murray PLLC, files this Complaint against Defendants Balanced Biotech Inc. and David P. Jones and states as follows:

## INTRODUCTION

1.      This lawsuit is necessary due to the greed of Defendants Balanced Biotech ("BB" or "the Company") and David P. Jones ("Jones") (collectively "Defendants"). BB engaged Spartan Brokers LLC ("Plaintiff" or "Spartan") to promote BB's business and to bring investors to the Company. Spartan did just that by, among other things, introducing BB to Jones, many prospective customers, as well as multiple investors ready to invest in BB to allow it to expand its business. Once BB secured investment through Spartan's contacts, but before any deal formally closed, BB suddenly and abruptly terminated the contract with Spartan without cause, presumably with the intent of not having to pay Spartan its contractually earned fees. BB then went behind Spartan's back and contracted directly with Jones, whose contract with Spartan prohibited him from contracting with BB. Neither Jones nor BB disclosed their activities to Spartan because they knew they were improper. Spartan is owed at least fees on the $1 million investment in BB and commissions on future investment or sale of BB's products to contacts introduced by Spartan to BB.

## PARTIES AND JURISDICTION

2.      Spartan is a limited liability company organized under the laws of the State of Michigan, with its office located in Shelby Township, Michigan. Spartan's two members are both citizens of the State of Michigan.

3. BB is a corporation organized under the laws of the State of Ohio, with its principal place of business located at 4 Pickett Place, New Albany, Ohio 43054.

4. Jones is a citizen of the State of Rhode Island who resides at 95 Victoria Ln, Wakefield, Rhode Island 02879.

5. This Court has subject matter jurisdiction under 28 USC § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

6. This Court has personal jurisdiction over Jones under MCL § 600.705 because Jones entered into a contract with Plaintiff for services rendered in Michigan and transacted business within Michigan.

7. This Court has personal jurisdiction over BB under MCL 600.711 because BB transacted business in Michigan and entered into a contract for services to be performed in Michigan.

8. Venue in this district is proper under 28 USC § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this district.

## BACKGROUND

**The BB-Spartan Broker Contract**

9. BB and Spartan entered into a contract ("Broker Contract") effective July 13, 2020. The Broker Contract is attached as **Exhibit 1**.

10. The Broker Contract provided Spartan would provide services to BB, including promoting the sale of the Company's products and services as well as seek investment for the Company. *Id.*

11. Spartan was to be paid commissions under the Broker Contract as outlined in Section 4, Section 5, and Exhibit B.

12. Section 5(b) of the Broker Contract provided that either party could terminate the Broker Contract with or without cause upon thirty-day written notice.

13. However, contacts introduced to BB by Spartan would be considered a current contact even after termination. If any financial payments were made by or through Spartan's contacts, the parties agreed all commissions would be paid to Spartan as outlined in Exhibit B.

14. Exhibit B of the Broker Agreement provides Spartan will receive a fee of 6% of net sales for transactions Spartan was involved in within thirty days of funding deposit.

15. Exhibit B also provides that if Spartan secured an investment for BB, Spartan will be paid a 10% fee of the gross investment and would be paid 2% of net profit on year by year basis. This payment is capped one of two ways: (a) when the total amount of the investment is repaid, or (b) five years, whichever comes first.

16. By way of example, a $1,000,000 investment in the Company would entitle Spartan to immediate payment of $100,000 (10% of the investment) and then 2% of the net profits of the Company until $1,000,000 is repaid or five years, whichever comes first.

17. BB's obligation to make the above payments expressly survives termination of the Broker Contract. *See* **Exhibit 1**, Sections 4, 5, and Exhibit B.

**The Spartan-Jones Contract**

18. Jones was introduced to Spartan by Patricia Gannon, a sales representative of Spartan and Jones' cousin.

19. On September 23, 2020, Spartan and Jones signed a Non-Circumvention/Non-Disclosure Agreement ("NCNDA"). (**Exhibit 2**).

20. As part of the NCNDA, Jones agreed he would "not, either directly or indirectly, interfere with, circumvent, usurp, divert, or disrupt any

agreement, business, contract, expectancy, relationship, opportunity, or prospect" held by Spartan. *Id.* at ¶ 9.

21. Furthermore, Jones agreed he would "not enter into any direct contract, relationship, agreement or arrangement, or arrangement with [Spartan's] customers and/or business expectancies that are divulged" to Jones during his association with Spartan. *Id.*

**Spartan works tirelessly to promote BB and seek investors for BB**

22. Spartan began work for BB in July 2020, pursuing investors in the Company and promoting the sale of a break-through and much-needed product called the Rapid On-the-Spot Coronavirus Test ("ROCT Test").

23. As BB describes on its website: "ROCT is a rapid antigen test for viral detection of COVID-19. It takes 5-10 minutes to run (we are optimizing it to run even faster). The ROCT platform has many advantages including the signal being detected using a cutting-edge technology and a smart device such as a cell phone or iPad which communicates with our digital platform providing real time reporting of the results."

24. BB was forecasting sales of the ROCT Test in the hundreds of millions of dollars in the fourth quarter of 2020 and 2021.

25. In August 2020, BB signed a Memorandum of Understanding ("MOU") with the State of Colorado for BB, upon Emergency Use

Authorization ("EUA") approval, to provide 22.5 million ROCTs to the State of Colorado at $17.50 per test kit.

26. This MOU alone, if fulfilled, would result in hundreds of millions in revenue to BB.

27. Spartan worked hundreds of hours to bring investors to BB so BB would have the funds necessary to do the work to obtain EUA approval.

28. Through its owners and sales representatives, Mark McCracken, Tom Shults, and Patricia Gannon, Spartan worked countless hours promoting sales of the ROCT Test to potential customers after EUA approval.

29. After the State of Colorado signed the MOU, the urgency of obtaining EUA approval increased, and the need for investment did as well.

30. BB advised Spartan it was seeking $1,000,000 in investment, $350,000 of which was needed immediately to obtain EUA approval, and $650,000 needed to continue and complete manufacturing operations.

31. Spartan fanned its network of contacts to secure the urgent investment sought by BB.

**Spartan introduces BB to Jones and willing investors**

32. Jones was introduced to Spartan by Gannon, a sales representative for Spartan.

33. Jones signed an NCNDA with Spartan and agreed to work for Spartan on September 23, 2020.

34. Spartan, Jones, and BB's owners, Raymond Kalmar and Paul Murphy had a conference call to discuss, among other things, the investment needed by BB.

35. Jones introduced multiple investors to Spartan, who facilitated those introductions to BB so BB could close on an investment for the Company.

36. Spartan exchanged multiple emails and provided a PowerPoint on BB to two venture capital firms ("VC Firms").

37. After reviewing the materials and communicating with Spartan and BB, BB proposed the VC firms invest in BB.

38. On October 9, 2020, BB and the VC Firms agreed via email that the VC Firms would invest $1,000,000 in BB, $350,000 initially, and then $650,000 after EUA approval.

39. The VC Firms advised they would put together a one-page agreement to reflect the terms of the investment.

**BB gives notice of termination, and BB and Jones surreptitiously work on cheating Spartan out of its contractually earned fee.**

40. Just four days later, while the agreement in principle was being finalized, BB sent notice of terminating the Broker Contract with Spartan.

41. BB wrote in an email, "[a]s of today, 13 October 2020, Balanced Biotech is terminating our joint contract with Spartan Brokers. All obligations up to this day and time will be honored."

42. BB gave no reasons for terminating the Broker Contract, nor did it ever discuss Spartan's termination before sending the notice.

43. As the Broker Contract required thirty-day notice to terminate, the Broker Contract remained in effect until November 12, 2020.

44. On November 4, 2020, Spartan asked Jones whether the VC firms' investment in BB closed, but Jones failed to respond.

45. After Jones did not respond, Spartan sent another follow-up email to Jones on November 12, 2020, and Jones again failed to respond.

46. On the same day BB sent notice of termination, Jones sent Gannon an email attaching his resume and letters of recommendation and asking Gannon to forward these to BB's owners.

47. Spartan subsequently learned that through the efforts and relationships of Jones, Gannon, and the VC Firms, on November 7, 2020, two investors made an investment of $1,000,000 in BB during the term of the Broker Contract.

48. Spartan has also learned that BB has submitted for EUA approval with the State of Colorado.

49. Paul Murphy agreed on behalf of BB to honor the Broker Contract with Spartan.

50. Despite these assurances, BB has refused to pay Spartan its contractually earned fees or agree to Spartan's future commissions based upon the Broker Contract's express terms.

51. Jones has failed to respond to why he contracted with BB in direct violation of his NCNDA with Spartan.

52. Defendants have left Spartan with no choice but to file this lawsuit seeking, among other things, payment of its contractually owed fees already earned as well as a declaratory ruling regarding future commissions.

## COUNT I - BREACH OF BROKER CONTRACT
## (BB Only)

53. Plaintiff incorporates the preceding paragraphs of this Complaint herein by reference.

54. The Broker Contract between Spartan and BB is a valid, binding contract.

55. Spartan fully performed its obligations under the Broker Contract.

56. As outlined above, Spartan breached its obligations under the Broker Agreement by failing to pay Spartan the commissions on the $1 million investment made during the term of the Broker Contract as required by Sections 4 and 5 and Exhibit B.

57. As a result of BB's breaches, Spartan has suffered substantial damages.

WHEREFORE, Spartan requests this Court enter judgment in favor of Spartan and against BB in excess of $75,000 plus interest, attorneys' fees, expenses and costs, and for such other and further relief as the Court may deem just, appropriate and equitable under the circumstances.

### COUNT II – DECLARATORY JUDGMENT
### (BB Only)

58. Plaintiff incorporates the preceding paragraphs of this Complaint herein by reference.

59. An actual case or controversy exists between Spartan and BB within the meaning of 28 U.S.C. § 2202, which is of sufficient immediacy and reality to warrant relief.

60. During the Broker Contact term, Spartan introduced BB to numerous contacts who are likely to purchase the ROCT Test after EUA approval or invest in the Company.

61. Section 5(b) of the Broker Contract provides these contacts will be treated as current contacts even after termination of the Broker Contract.

62. Section 5(b) also provides that if any financial payments are made by or through these contracts, Spartan will receive the Broker Agreement's commissions.

63. BB refuses to acknowledge these ongoing obligations under the Broker Contract.

64. BB projects hundreds of millions of dollars in sales of the ROCT Test in the next year, some of which will be made to contacts introduced to BB by Spartan.

65. Spartan seeks a declaratory judgment that the obligation to pay commissions to Spartan as outlined in Section 5(b) and Exhibit B of the Broker Contract are ongoing regardless of the termination of the Broker Agreement.

## COUNT III – BREACH OF NCNDA
## (Jones Only)

66. Plaintiff incorporates the preceding paragraphs of this Complaint herein by reference.

67. The NCNDA between Spartan and Jones is a valid, binding contract.

68. Spartan fully performed its obligations under the NCNDA.

69. As set forth above, Jones breached the NCNDA by, among other things, interfering with, circumventing, usurping, diverting, and disrupting Spartan's contract with BB, and by entering into a contract, relationship or agreement with BB which his NCNDA expressly prohibited.

70. As a result of Jones' breaches, Spartan has suffered substantial damages.

WHEREFORE, Spartan requests this Court enter judgment in favor of Spartan and against Jones in excess of $75,000 plus interest, attorneys' fees, expenses and costs, and for such other and further relief as the Court may deem just, appropriate and equitable under the circumstances.

### COUNT IV – TORTIOUS INTERFERENCE
### (Jones Only)

71. Plaintiff incorporates the preceding paragraphs of this Complaint herein by reference.

72. Jones was aware of Spartan's contract with BB.

73. Jones improperly and intentionally interfered with Spartan's Broker Contract with BB by inducing BB to terminate Spartan and enter into a separate agreement with Jones.

74. Jones's conduct caused BB to breach the Broker Contract with Spartan.

75. Spartan was damaged as a result of Jones's conduct.

WHEREFORE, Spartan requests this Court enter judgment in favor of Spartan and against Jones in excess of $75,000 plus interest, attorneys' fees, expenses and costs, and for such other and further relief as the Court may deem just, appropriate and equitable under the circumstances.

## COUNT V – UNJUST ENRICHMENT
## (BB Only)

76. Plaintiff incorporates the preceding paragraphs of this Complaint herein by reference.

77. This count is being pleaded in the alternative if the Court finds no contract between the parties or that the Broker Contact only covered a limited time or contacts.

78. Spartan provided hundreds of hours of work to BB to make introductions to investors and customers and produce Gantt charts and other work product valuable to the manufacturing of the ROCT Tests.

79. Spartan's services resulted in BB receiving investment in the Company and will result in sales of ROCT Tests in the hundreds of millions of dollars.

80. Spartan rendered services under circumstances under which BB should have expected that Spartan would expect to be compensated.

81. It would be inequitable to allow BB to retain this benefit without compensating Spartan.

82. Spartan should be awarded damages that would equitably compensate Spartan for the benefit conferred upon BB to avoid unjust enrichment.

WHEREFORE, Spartan requests this Court enter judgment in favor of Spartan and against BB in excess of $75,000 plus interest, attorneys' fees, expenses and costs, and for such other and further relief as the Court may deem just, appropriate and equitable under the circumstances.

### COUNT VI – PROMISSORY ESTOPPEL
### (BB Only)

83. Plaintiff incorporates the preceding paragraphs of this Complaint herein by reference.

84. Paul Murphy promised on multiple occasions that BB would honor the Broker Contract.

85. Raymond Kalmar promised to pay a six percent commission on purchase orders or MOUs once fulfilled.

86. Murphy and Kalmar's promises were clear, definite, unequivocal, and specifically made to induce Spartan to continue to work for BB.

87. In reliance upon the promises, and to its substantial detriment, Spartan continued to work for BB to bring in customers and investors.

88. To avoid injustice, this Court must specifically enforce BB's promises to Spartan.

89. As a result of BB's wrongful refusal to honor its promises to Spartan, Spartan has suffered and will continue to suffer damages.

WHEREFORE, Spartan requests this Court enter judgment in favor of Spartan and against BB in excess of $75,000 plus interest, attorneys' fees, expenses and costs, and for such other and further relief as the Court may deem just, appropriate and equitable under the circumstances.

## REQUESTS FOR RELIEF

WHEREFORE, Spartan prays for the Court to order the following relief:

A. Compensatory damages for Spartan for at least $1,100,000 to be determined at trial;

B. Declaratory judgment that future commissions are owed consistent with the terms of the Broker Contract; and

C. Any other relief the Court deems just, fair, necessary, or equitable.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

        Respectfully Submitted,

        KING & MURRAY PLLC


        By: /s/Thomas J. Murray
           Thomas J. Murray (P56331)
           KING & MURRAY PLLC
           Attorneys for Plaintiff
           355 S. Old Woodward, Ste. 100
           Birmingham, MI 48009
           (248) 792-2397
           tmurray@kingandmurray.com

Dated: December 14, 2020