# EXHIBIT 1

# SALES REPRESENTATIVE AGREEMENT

This Sales Representative Agreement (Agreement) is made on July 13, 2020 (Effective Date), by and between, Raymond Kalmar and Paul Murphy on behalf of Balance Biotech Inc. (Company), whose address is 4 Pickett Place, New Albany, Ohio 43054, and Thomas Shults and Mark McCracken on behalf of Spartan Brokers LLC (Brokers), whose address is 52018 Loon Ct., Shelby Township, MI 48315.

## RECITALS:

1. The Company desires to engage the services of Brokers to represent the Company in the promotion and sale of its products and services to its customers.

2. Brokers desires to represent the Company in the promotion and sale of the products and services offered by the Company on the terms and conditions set forth in this Agreement.

In consideration of the recitals and the mutual covenants contained in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which are acknowledged, the parties agree as follows:

1. *Certain Definitions.* As used in this Agreement, the following definitions shall apply:

    (a) "Completed Sale" means the full consummation of a sale of Products to a customer for which sale the Company has received payment in full during the Term.

    (b) "Gross Sales Price" means the sales price charged by the Company to its customers for Products, less (i) all shipping charges; (ii) all excise and sales taxes and similar charges; (iii) all insurance charges covering Products while in transit; (iv) any trade, quantity, and other similar discounts, rebates, and/or allowances; (v) any credits for returned Products; and (vi) any other adjustments, allowances, credits, or discounts given for Products.

    (c) "Product(s)" means those products sold by the Company to its customers during the Term of this Agreement.

    (d) "Term" has the meaning provided in Section 5(a).

    (e) "Territory" means the geographical area set forth on Exhibit A.

2. *Appointment.*

    (a) Company appoints Brokers, and Brokers accepts the appointment, to be the Company's nonexclusive sales representative for Products sold and to be sold to

customers of the Company in the Territory and to assist the Company at the request of the Company to maintain a positive relationship between the Company and its customers, as may be reasonably requested by the Company during the Term.

(b) Brokers is acting solely as an independent contractor. Brokers authority is limited to the promotion of orders. The Company reserves the right, in its sole discretion, to accept or reject any purchase order. All decisions regarding the strategic planning, marketing, business, corporate direction, or other decisions relating to the Company or the Products shall be the sole right and responsibility of the Company. Brokers shall have no authority to bind the Company to any contract, representation, understanding, act, or deed concerning the Company. This Agreement shall not be deemed to establish a joint venture or partnership. Brokers shall make no warranties or representations on behalf of the Company.

3. *Duties of Brokers.* Brokers shall at all times remain cooperative with the Company and shall project the Company in a positive manner to the Company's customers. Brokers shall never disparage the Company.

4. *Commissions.*

(a) The Company shall pay to Sales Representative, as full and total compensation for all services provided and expenses incurred by Brokers in connection with its performance under this Agreement, commissions in the amounts and at the times set forth on attached Exhibit B, which the Company may amend or otherwise modify at any time, and from time to time. Commissions shall be calculated and paid based on the Gross Sales Price: (a) for Products for which Completed Sales have occurred during the Term and (b) for Products for which sales continue after the end of the Term to customers to whom Brokers has made Completed Sales during the Term, for as long as identical Product continues to be produced and sold by the Company to such customers (the life of the identical part to the same customer).

(b) All commissions payable by the Company under this Agreement shall be due and payable to Brokers no later than the 25th calendar day after the close of the financial month during which the Company receives payment in full for the Completed Sale giving rise to the commissions.

5. *Term and Cancellation.*

(a) This Agreement shall be effective as of the Effective Date listed on the first page of this Agreement and shall continue in effect for a period of _(1)_ year(s) (Initial Term), after which this Agreement shall be automatically renewed for successive _(1)_-year periods (each, a "Renewal Term"), unless terminated as set forth in this Section. For purposes of this Agreement, the Initial Term and any Renewal Terms are collectively referred to as the "Term."

(b) Either party shall have the right to terminate this Agreement with or without cause on 30 calendar days' written notice. All contacts that Brokers have made to date will be held as current contact list and if any of Brokers contacts ends up making a financial payment, all commission will follow as listed on this contract.

(c) This Agreement shall immediately terminate (i) on the dissolution bankruptcy or insolvency of the Brokers or Company, (ii) on the sale or disposition of a majority interest of Brokers or the sale of a majority of Brokers operating assets, or (iii) on the death of Brokers Representatives.

(d) On termination of this Agreement, neither party shall be liable to the other for any damages or indemnity whatsoever sustained or arising out of, or alleged to have arisen out of, the termination, whether on account of a party's loss of present or prospective profits, commissions or compensation on anticipated sales, or in connection with the establishment, development, or maintenance of Brokers business, or otherwise, but the termination shall not affect the right of either party to receive or recover (i) damages sustained by reason of the breach of this Agreement by the other party or (ii) any payments that may then be owing under the terms of this Agreement.

6. *Confidential Information.* Brokers shall retain in strict confidence and, except as otherwise expressly provided in this Agreement, not use or disclose to others any proprietary information received from the Company, including but not limited to know-how, compilations, processes, plans, blueprints, technical information, new product information, test procedures, product samples, pricing, marketing plans, or specifications as well as commercial and other information or data considered proprietary or confidential in nature, whether communicated in writing or orally (Confidential Information); provided, however, that Confidential Information shall not include

(a) information that, at the time of disclosure, is in the public domain or becomes part of the public domain by publication or otherwise through no act of the party receiving it;

(b) information that Brokers can conclusively establish was in its possession before the time of disclosure and was not acquired directly or indirectly from the disclosing party or any of its employees or affiliates; or

(c) information that is independently made available as a matter of right by a third party who has not violated a confidential relationship with the Company.

7. *Indemnification.*

(a) Brokers shall indemnify and hold harmless the Company and the Company's agents, employees, officers, directors, successors, and assigns from and against

any and all damages, liabilities, losses, expenses, costs, or claims (including, without limitation, reasonable attorney fees) arising out of or related to (i) Brokers breach of this Agreement or (ii) any act or omission of Brokers, its employees, agents, or representatives.

(b) The Company shall indemnify and hold harmless Brokers, and Broker's agents, employees, officers, directors, successors, and assigns, from and against any and all damages, liabilities, losses, expenses, costs, or claims (including, without limitation, reasonable attorney fees) arising out of or related to (i) the Company's breach of this Agreement or (ii) any act or omission of the Company.

8. *Non-assignment.* Brokers may not assign or transfer any of its rights or delegate the performance of any of its duties under this Agreement without the Company's prior written consent. The Company may assign or transfer its rights and delegate the performance of its duties under this Agreement, in whole or in part, to any affiliate of the Company or to any successor in interest or transferee of any portion of the Company's business relating to this Agreement.

9. *Notices.* Any notice required or permitted to be given under this Agreement must be in writing and must be served by hand delivery with receipt, or by a nationally recognized overnight delivery service, or by express mail or certified mail return receipt requested. Notice shall be effective on tender of delivery at the notice address during ordinary business hours. Any communication given in any other manner shall be effective only if and when received by the party to be notified. For purposes of this section, the notice addresses of the parties shall be as set forth in the first paragraph of this Agreement. Any party may change the address to which communications are to be sent by notice to the other party as provided in this Agreement.

10. *Entire Agreement.* This Agreement and Exhibits A and B set forth the entire Agreement and understanding between the parties as to its subject matter and supersedes all prior agreements between the parties. Neither of the parties shall be bound by any conditions, definitions, representations, or warranties with respect to the subject matter other than as expressly provided in this Agreement.

11. *Waiver; Amendment.* This Agreement may not be amended except by an instrument in writing signed on behalf of each of the Company and Brokers. No amendment, supplement, modification, or waiver of this Agreement will be binding unless executed in writing by the party to be bound by it. No waiver of any of the provisions of this Agreement will be deemed or will constitute a waiver of any other provision (whether or not similar), nor will the waiver constitute a continuing waiver unless otherwise expressly provided.

12. *Governing Law.* This Agreement shall be deemed to have been executed and entered into in the State of Michigan, and this Agreement and its formation, operation, and performance shall be governed, construed, performed, and enforced in

accordance with the substantive laws of that state without regard to its conflict-of-law principles.

13. *Third-Party Beneficiaries.* This Agreement is made solely for the benefit of the parties to this Agreement. Nothing contained in this Agreement shall be deemed to give any person, partnership, joint venture, corporation, limited liability company, governmental entity, or other entity any right to enforce any of the provisions of this Agreement, nor shall any of them be a third-party beneficiary of this Agreement.

14. *Counterparts; Facsimile.* This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument. This Agreement may be executed and delivered by facsimile transmission, and a facsimile or this Agreement or of a signature of a party will be effective as an original.

The parties have executed this Agreement on the date listed on the first page.

Balance Biotech Inc.

(Company)

_____ 16 July 2020

Raymond Kalmar

Its: CEO

Spartan Brokers LLC.

(Brokers)

_____ July 16, 2020

Mark McCracken

Its: President

_____

Paul Murphy  July 16, 2020

Its: COO

_____ 7/17/20

Thomas Shults

Its: COO

## EXHIBIT A - TERRITORY

Broker territory is unlimited geographically. Company may also utilize other groups for growth of company. Broker will not have exclusive rights.

## EXHIBIT B – COMMISSIONS

Balance Biotech Inc, agrees to pay Spartan Brokers, LLC a commission in the following manner for each Completed Sale attributable to the actions and/or efforts of Brokers.

(a.) If Brokers direct sales of the Company products and/or services, Company agrees to pay Brokers a fee of 6% of Net Sales for transactions that Brokers were involved within 30 days of funding deposit.

(b.) If Brokers secures investment for Company, Brokers will be paid a 10% fee of Gross Investment. Brokers will also be awarded 2% of net profit on a year by year basis. This residual can be capped two ways, either (1) the amount of total investment or (2) 5 years, which ever comes first. This residual payment will be paid out at the end of January, yearly.

(c.) If Brokers secures a buyer for Company, Broker will be paid 10% of total purchase price at closing. If company is sold by other means during the period of the contract, Brokers will be awarded a percentage (TBD) of the sale of Company for services provided.

An annual bonus system will be discussed at every transaction to provide clarity for bonuses based on sales milestones.

Payment shall be remitted to Brokers pursuant to Paragraph 4(b).